Case Numbers 20-34-61, M.J. et al. v. Akron City School Dist Bd Ed et al. and 20-34-62, M.H. et al. v. Akron City School Dist Bd Ed et al. Oral argument not to exceed 20 minutes per side. Mr. Gilbert, you may proceed for the appellants. Thank you. If it pleases the court, I'm Edward L. Gilbert from Akron, Ohio, representing the appellants here. I would like to reserve five minutes of my time for rebuttal. As the court knows, we have six assignments of error here. I may not, with the limited time, be able to speak to each one. I would hope that that would not be considered a waiver of those claims. I would rely on my briefs if I'm not able to get to all of them. The first and second assignment of error is what I'd like to start out with, first being the district court error in failing to recognize that the respondent's action led to a state-created danger in regards to MH, and second, that the court failed to properly apply the Supreme Court ruling on White v. Pauley. The court's interpretation, in our view, results to a de facto repeal of 42 U.S.C. 1983, and unfairly prejudiced the plaintiff. Now, in regards to the first matter, the plaintiff alleged, in this case, that APS, Akron Public Schools, created a danger by creating a series of affirmative acts that increased the risk that MH and MJ would be harmed by a third party actor, Mr. Chris Hendon. The court did find, in page 28 of its order, that in MJ's case, the child was nine years old, was worse off after contact with Hendon than before. That's also supported by psychological reports, and by the way, we did get psychological reports. Mr. Gilbert, I have a question about the state-created danger doctrine, and one of the requirements, so if you think of Vincente, who is clearly one of the more important defendants here, it's fair to say she would have known about the handcuffing, and that that was a risk, say, to MJ, but why a risk of being within the zone of danger that Vincente would have known? Do you hear what I'm saying? Yes, Your Honor, what happened here is that Vincente provided that room for Mr. Hendon to do his act, and that's what the court found, and then she, rather than understand or stay around, she left the building, and so the court found that, in fact, that her providing that room for him to do his act was, in fact, an affirmative act, which we certainly agree with, and the other items that the court found on page 28 in regards to MJ is that the secretaries provided confidential information to Hendon for this child and other children, report cards in particular. Secondly, the court found that the special education teacher sought out Hendon to provide some type of discipline toward this child because he was doing backflips in the school ground, and then, finally, in regards to the private room, the court found that that was inappropriate, and that was an affirmative act, and also, Vincente calling MJ the mother was also an affirmative act. What's your best case on qualified immunity for these? What's your best kind of clearly established case? Well, we have it in our brief, Your Honor, and I was going to get to that in the last part of my argument, but qualified, I don't know if you want me to go to that now or not, but... If you wouldn't mind, I mean, it's your call how you do this. Yes, well, in my view, Your Honor, qualified immunity in this series of cases has run amok, being quite honest about it, because to say that the one size fits all in regards to qualified immunity is inappropriate. We don't have a situation here where you have an officer running down somebody in a back alley that has a gun. These are kids. These are children, and to say that the same analysis for this type of case in a police misconduct case is inappropriate, and also, in regards to this case, we have clearly established statutes that identify here what the responsibility of these teachers are, 3319.41, for example. I'm sorry, Your Honor. Counsel, if I could interrupt. Your brief quite well makes the point that you don't have to have an exactly on-point case to be clearly established, but you do have to have a somewhat similar case, and in your briefing, when I'm reading along there, where you talk about Paul E. B. White, and so on, and I'm really kind of with you, and I say, okay, where is his somewhat similar case? And maybe that was Judge Sutton's question as well. What would be your best somewhat similar case, to me, where you have, in effect, a fraud being perpetrated on pretty stupid or negligent or perhaps complicit public employees? In other words, it's not that the principal beat up the did a bunch of stupid things that let somebody else do it, and I'm saying, give me your best case that you would call similar to this. Well, that's where I have, there is no similar case, to be quite honest, and I'll put it up front, Your Honor, and that's what the court filed, and I don't think we need to have that, because if you read the qualified immunity requirements, it says, if an action do not clearly establish statutory or constitutional rights. Here, we have statutory rights here that were violated. 3319.41 clearly states, that's been the law for I don't know how long, that there will be no corporal punishment, and all of these people concluded and did say clearly that handcuffing the child was corporal punishment. The superintendent himself said he can't imagine a scenario where you would be handcuffing a student of this age. At least limited to handcuffing, your argument is no corporal punishment. They know about it. Handcuffing is corporal punishment, end of case. Now, that doesn't get you to the off-site or at least that's two separate arguments. Would you agree to that? Well, I would agree, but they're kind of intertwined in the sense that 2151.421 clearly says that any teacher or official who actually witnesses punishment, corporal punishment, is required to report it, and we're relying on statutory authority here that's quite clear, and all of them were aware of it. Statutory authority says that they don't give a pass to a police officer, even if they thought it was a police officer. He doesn't get a pass for a corporal punishment of a child. Our situation is here that we have statutory authority coming out of the kazoo, so to say, saying that this is a situation that is inappropriate and it's abuse, you know it's abuse, you can't just turn your head and put your head in the sand and walk away. Vincente, giving this man a room and then turning around and then not knowing what's going on because she puts her head in the sand and walks the other way is inappropriate. So in our view, the qualified immunity issue is one that should be not necessarily compared with a police misconduct. One size does not fit all here, and I think that this court should make that clear that you do have situations here where you have clearly established statutes that they know about, they admit in deposition they knew about, and my god, what else can we do? But to say that we are in the same boat as a police misconduct case, I think it's really overstepping and way beyond bounds. And if I could continue on with the WH case, the comparison, I think, between the two cases where the court found there was affirmative acts and the one which they found in MH that there was no affirmative act, I think there's the correlation there is really interesting. I think the court really ignored some of the real facts here. For example, in the first case, we know that the court found that the secretary's giving him the report cards of other students was inappropriate. That's the same thing that in WH. This man then comes to the MH's home and has in his hand report cards from other students that he got from the school. Secondly, the court indicates that in regards to Morrison, we think her conclusion was inappropriate because with Morrison, she said that he was a police officer. She never said that. In fact, on page 21 and 22 of her deposition, she asked him then on a number of times, do you work for Akron Police Department? He never says he works for Akron Police Department. He says he works for Akron. Council, you've got a little more than four minutes left in your opening. Were you going to get to the unsworn police statements, statements to police, or is that something you'd rather not focus on in oral argument? Certainly, I would like to focus on it, Your Honor, and I'll go directly to that if you like. What's the prejudice from those? How did that, how exactly did that undermine your case? What was the missing ingredient that they supplied that you didn't have? Well, Your Honor, what happened here is that the testimony and deposition differed from the statements that these employees gave to the officers. And when I say differ, they were exaggerated in regards to the police officers. For example, Vincente says that Mr. Hendon came there with this guy named James, which we all, that's clear in the record. And she says James was his sidekick and that she was very clear on saying, then a deposition, I asked her about sidekick, she didn't remember it. And she said, yeah, okay, yeah, I called him, he was a sidekick. And for them to- Did you ask, did you ask in the depositions about the statements that were made to the police during the interviews? I mean, were they deposition exhibits or they, did you ask them to affirm that everything they said in those statements was, I mean, I don't know whether that would appropriate or not, but was there, seems like you had a deposition opportunity. So why, I guess, go back to Judge Sutton's question, why is there any prejudice here? Okay. Here's the way this happened. The reports were taped. We all got those reports, plaintiff and defendant got the reports. We transcribed by a court reporter. And what I did in the deposition, I would ask them, did you tell anyone, did you tell the officer, for example, in Vincenti's case, did you tell the officer that James was this fellow's sidekick? And that's the way I approached it. I did not mark them as exhibits. This was fair game in the sense that we all had the same thing. I asked them to identify whether they said certain things to the officers. That's the way I approached it. And under 801, I thought that was very appropriate because they did give these reports in the capacity of an employee. Counsel, let's just say you're right that maybe Judge Leoy made a misstep. You got to depose them. Who cares? I'm sorry, Your Honor. I didn't quite understand. Why do we care about these statements if you had a chance to depose them and you were not able to identify? It sounds like you really had a chance to sort out what happened. Yeah, I did have a chance to sort out what happened and I did. And I think what the court is saying, the trial court is saying, that I did go from the deposition and cited the deposition versus these statements and showed the inconsistency. There were numerous of them, but I did have the deposition. And quite frankly, the depositions made the day. I'll agree with you that. But my point is that the other statements did show the fact that they were exaggerating certain things. There were some things that were definitely inconsistent. But overall, the depositions did carry the day. That is correct. Were there any of the police tapes, I'll call them, of people that you did not depose? Was there any of the evidence that we're looking at here or that's talked about in your brief that is from anyone who was not also deposed? There is one person that was in our brief, but we did not raise them in this case. There was one person that did give a statement that indicated to the officers that she had to sign in every time she would come in. I did not depose that person. What's that person's name? Oh, boy. Okay. If that's a problem, we can look it up. Yeah. But that was not a real issue in this matter. It was just to show that, and really, that was consistent with the other testimony of the secretaries. And that is, the secretary said that some people they did not order to sign in. And specifically, they highlighted the police according to this one person who observed some things that was just inconsistent. And that was not a critical point, but that was just a point being said to confirm what was really happening overall with the secretaries. Steven, your time is up there. Yeah. See, you'll get your rebuttal. So we'll hear from Mr. Strang at this point. Thank you. My name is Steven Strang, and I represent Principal Philomena Vincente, Teachers Teresa Morrison and Jennifer Ramon, Superintendent David James in the Akron City School District Board of Education. My clients are lifetime educators who chose to teach at Leggett. They care deeply about their students in the school community. Christopher Hendon- I just ask you, I don't know that it's the central issue in the case, so I don't want to distract you too much, but I just want to make sure I'm getting this. So the hearsay ruling, I just wasn't sure about the idea that this was not within the scope of their responsibility. I mean, in one sense, you could say, well, yeah, it wasn't within the scope of their responsibility to participate in or be witnesses to people doing bad things. But it is within the scope of their responsibility to be teachers, to be at the school and to observe what's happening. In other words, the interviews were about things that happened at school. So I wondered if you had a backup argument to that, a response to it. I mean, it's also kind of seems to be hearsay within hearsay. I suppose there could be a business records exception to the second point that, you know, notarizing these, but I just wonder if you had any thoughts about that. Yeah, Your Honor, I can talk about that. I can start out with that. I think that these police statements, and there are a couple different types, are hearsay within hearsay. There are some written statements that the police detective himself transcribed, which are multiple layers of hearsay, as well as demonstrably untrustworthy because even the plaintiffs who had written statements taken down by this detective said that there were some inaccuracies in what the detective wrote down. You agree there's a party opponent exception, right? Right? Yes, I agree that there's a party. And so, I mean, Judge Leo is such a good judge, I'm inclined to think she's right, but I just wasn't sure I understood the point that it was outside the scope of their responsibility. And maybe the answer is, who cares? They were deposed and that's the way to think about this. But I'm struggling a little bit with the idea it was not in the scope of their responsibility to talk about what they saw in the school when they were serving as teachers, superintendent, principal, whatever it was. Yeah, Your Honor, I think there would be a difference between a statement prepared by the school, as in if it was a document prepared during the school's investigation in the ordinary course of a, let's say the school has a policy that they conduct investigations after incidents like this. If it was conducted during an internal investigation, then sure, it would be a business record. But in this case, it was not conducted by the school. This was during a police investigation. Isn't the question not where they said it, but whether the things they said were about things within their responsibility. If you have a timekeeper who says, I clocked Sally in at 608, I don't care whether he said it in a bar, wouldn't that be still within the party admission? It's not that they were supposed to talk to the police. It's what they're talking about. Isn't that the correct reading of the law? Well, Your Honor, I think there's a difference between the party opponent and the business records exception. So I don't think it's a business record exception. I think for a business record, it's got to be. I agree with you on that, but yeah. And in fairness, that wasn't raised. That's not that's not been briefed. So, you know, that's your answer to that. But when I go down the no prejudice line that it was, there were depositions of the key players. Well, Your Honor, yeah. I mean, this is just simply not proper 56 F evidence. Statements need to be sworn. There's a reason why we take depositions. Everyone had these tapes. Everyone had the written statements, the recordings. Judge Loy was correct that the proper way to have handled this was to have authenticated these statements during the deposition. So part of the problem is that these are unsworn statements. But we have all kinds of evidence and summary judgment all the time that's not sworn. I mean, I have emails that get sent out of business. Nobody swears to their authenticity. Why does it have to be sworn? It's not offered as a affidavit or a declaration or a deposition, right? These are just statements. They just have to meet the hearsay rule, right? Why do they have to be sworn? Your Honor, I think they do have to be sworn. I think there has to be an affidavit that authenticates the fact that these emails that you get attached to a motion for summary judgment are true and accurate, that they were sent at the right at the time. But we don't have that rule anymore, do we? Didn't the rule get changed? Rule 56 got changed on that front, didn't it? Your Honor, I still think there's something that has to be a declaration. It has to be a sworn statement. You just can't attach things to a motion for summary judgment that are essentially unauthenticated, which is what happened in this case. And there was specific opportunity to cure this, and it wasn't taken. And I think the heart of the matter is that it was specifically so that these opponents would not get the chance to clear up their statements, to explain the context that they provided these statements in. They were not confronted with the statements and allowed to explain them or said, were you, you know, on this day, was your testimony, was it sworn? Do you agree with everything you said during that day? But this isn't testimony, right? They're just witness interviews. I mean, they're not testimony. They're not under oath. That's right. But it doesn't mean it's not competent evidence, is it? I mean, you can, I think it might be hearsay. It might be hearsay within hearsay, but it's not just because you don't swear to something doesn't mean that it's not competent evidence, right? Well, I think there's a difference between trial evidence and rule 56 F evidence. I think for rule 56 F evidence, then you, it does need to be authenticated. Otherwise, then we wouldn't have depositions in this case. And we, I think we do. So you're saying these are, you're saying they weren't authenticated. Are you saying that the transcripts are not, there's a possibility they're not authentic or they're made up? Are you challenging the authenticity? Your honor, I, I'm not accusing anyone of making anything up. I'm, I have no, I have no knowledge of what the, of this, uh, of whether the court. Your adversary says, and I thought it was clear that, that you really had the tapes, the whole transcription versus tapes point seemed odd to me in the sense that if you had the tapes and anybody was concerned, the evidence is the tapes that gets you out of the hearsay within hearsay, unless somebody argues that there's a difference. I mean, is he right? That everybody had the tapes and that there was some discussion of discrepancy. Correct. Everyone had the tapes and the tapes were specifically, then there's an extra step of the tapes being transcribed in neither the tapes nor the transcription being shown to the witness during the depositions in the witness, then having the opportunity to essentially say, yes, that's my voice. Yes. I was telling the truth. Yes. This testimony is what I believed at the time. And I think you need that to attach to a motion for summary judgment under rule 56 F. And so what we have here ultimately is, are you conceding, um, that if this was a mistake by the trial court, that there was prejudice? No, your honor. I absolutely not. At the end of it, maybe you should explain that. Yeah. Your honor. Look at the end of the day, this is a absolute textbook qualified immunity case. There is this situation was unprecedented, unanticipated, frankly, bizarre. And what, you know, and looking back on this, it's, it's head scratching and I'll tell you, and I'll, and I'll be very candid with you. Everybody involved in this is embarrassed because looking back on this, this is absurd. And this is one of those situations where you look back and go like, Oh, let me ask you this question about whether it's a bizarre case or not. I don't, whether this guy was a fake police officer. I mean, he was, but isn't that kind of a red Herring? I mean, a real police officer wouldn't have been allowed to discipline kids in a school, right. Or you're not supposed to do that. Like if he's a real police officer, there was nothing that he did that would have been permitted in terms of disciplining kids or handcuffing them or making them do exercises or any of that stuff. Right. Your honor. I agree with you on the first point. I disagree with you on the second point. I do think that the fact that he was a fake police officer adds a kind of a, a, a, a Lord of part of this case. It makes it a But I think ultimately it is a red hair and that essentially you have to look at this, like this was a real police officer because that's what everybody thought at the time. And the, I think what Christopher Hennon was specifically trying to do is to take advantage of the natural deference that people give to police officers. And the fact that police officers occupy a unique position everywhere, including at Leggett school in all of the way. Just to cut to the chase, your argument would be that if this had been a real police officer, the case should come out exactly the same way. Oh, absolutely. Your honor. Absolutely. And absolutely. The, um, the, the, the fact each witness testified that was a Leggett employee testified that, that the fact that this guy was a police officer was the part that made things confusing and that they essentially were faced with a situation that they didn't know what to do. They, if this guy was a UPS driver, if he was a paramedic, if he was a gym teacher, if he was any other position, any other job that you could think of, they would have clearly known what their role is. They would have known whether school policy. So then you do say, you do say that at this school, these public officials, uh, would have no liability for allowing, helping a real policeman, uh, you know, pass the part about getting them in the room and throwing them against the wall, uh, to handcuff children, uh, uh, take them back and forth, uh, to the everybody knew about. So at least up until the point of throwing them against the throwing MJ against the wall, everybody was, was on board about that. Were they not? And you say that's still okay. No, your honor. I don't believe everyone was on board on, on, on, on, on what he was doing. So it was perpetuating a fraud, not only with his identity, but what he was doing with the school. He was specifically taking pains to hide what he was doing to certain people and to do certain things in private. The particular, I'm going to pick on the exercises. The exercises was everybody testified that he did this essentially in an empty auditorium. Nobody saw it. None of the defendants knew that he did this. Nobody knew that he, um, put his hands on the plaintiff, uh, MJ until after the fact, nobody knew what was going on at the time. Um, of course there's the, uh, handcuffing. Um, I want to note that the plaintiff and MJ, the only handcuffing occurred outside of school on a Saturday with the express consent of his mother, there was no handcuffing of MJ at school. Um, is it just to be clear? I, I, I must've read things a little too casually. I thought there were some other handcuffing incidents that the there was, uh, there were, I think Ms. Vincente testified that she saw, um, three children handcuffed at school. Um, but she was very clear that, and she was, she was insistent that the key part of that was that their parents were there and their parents had given consent to it. So in her opinion, the parents are the ones that make the decisions. And so at that point, she, as a principal no longer had authority over what a parent agrees to do with their child. Um, even in the school setting. And I think that's ultimately correct. When you look at the law relating to, um, who actually aren't there, aren't there some limits on that? I mean, you, you, you see someone escorting some kids with their handcuff behind their back, they're shackled in their legs and the principal says, well, their parents were with them and you just let it go. I mean, that, that's astonishing to me. Well, your honor, I don't think she saw. So, so I want to be very clear on what happened at this school and what Ms. Vincente saw. And I think it's clear that I just asked you a hypothetical. I know what I just said did not happen. Um, I'm making the and to say, well, their parents were there, not my problem. Well, it is kind of your problem because they're in school. And in fact, it could be that the parents are doing exactly the opposite. The parents are looking at the principal seeming to be okay with the handcuffs. And so the parents are like, Hey, parents, Patriot in school, that's their choice. So I, you know, it seems, I don't Vincente testified that she did not. I mean, she didn't like it. She didn't approve of it. She didn't encourage it. Um, and some of the staff testified, particularly in the MH case that they, in fact, that it would, they were shocked and saddened to see the child handcuffed, but that essentially the mother expressively, uh, provided consent to it. And that, uh, they believe that she essentially could do it. And sorry, John, go ahead. Uh, no, I, I'm sorry. I thought I interrupted you. No, no, no. You got you. I, I was, I was incredulous like you about the parents can pay as long as the parent says it's okay. They can do whatever they want in the school. I, I think we've covered that one. All right. Sorry, Mr. Stein. Go ahead. Yes. So I did also want to mention that, um, you know, essentially this is a judge who would dismiss this case on qualified immunity. Can I ask a quick, can I go back before you get to another point? Can I go back to the witness statement issue? And I just want to tie it back together. The, the police investigation at the time they were investigating was about whether he was a real cop or not. I mean, that was the focus of the investigation. So when they were questioning or when they were asking questions were about people signing in or how did you know he was a cop or not a cop, that kind of thing. In other words, it, that they weren't investigating or were they, what he was actually doing at the school or were they. The investigation. So Christopher Hendon was criminally convicted and he was in jail. I think he's out now, but the investigation centered around, um, not didn't center specifically. It wasn't focused only on Leggett, but Christopher Hendon had taken students. He had actually done this at Middlebury Academy, another school. And he had gotten so far as to actually conduct assemblies in front of the school at Middlebury Academy. Uh, he had also actually taken children, um, from, I believe Middlebury to the juvenile detention center. He actually got the kids into the juvenile detention center and pass security, got them. Actually, there are pictures that he showed the teachers in this case. And we filed those. They're, they're part of the affidavits of Morrison and Ramon. Um, and, um, you know, he's, he's got specific pictures with, uh. So what, I guess my question is, what would the substance of the evidence, what part of the claim would it go to the witness interviews if they were fully admissible? I guess maybe I, for the other side, but is it, is it, is it just, does it just go to his identity or not as a police officer and how he got into the school or would it go? How would it impact the knowledge, the defendant's knowledge of what exactly he was doing as part of the, the elements of state created danger? It would, it, the, the statements involved at this point, everybody knew he was a fake cop. So it was basically what he was doing at Leggett. So it would, it would involve what he did at Leggett, uh, what he, what the various defendants witnessed at the school, what was going on at the school. Um, and that was part of the criminal investigation into Hendon for essentially taking these kids. Um, and I don't have the elements of what he was fraudulently bluffing his way into the juvenile detention center, but also, um, taking these kids, uh, uh, I think there's a kidnapping charge or, or something similar to a kidnapping charge in there. Also what happened at Leggett and how he was able to take the kids out of Leggett, but also the juvenile detention center and also Middlebury Academy. So Leggett was it, were there, was it charged with like abuse or battery or assault or some physical tort or okay. Yeah, he was, he was, um, the, the sentence, I think we put that in the record, but the, uh, the sentencing documents show that he was, he was charged with, with, uh, with quite a few that did not hold back on what he was charged with. Um, I did want to make a point before, um, before my time is up that again, there's no, there's no case law that I could find that's even tangentially on point with this. And I think that white first poly reaffirms the fact that you do have to find a similar case. Um, and Mr. Gilbert talked about statutes. These are state statutes. State statutes do not. Do you think a state, do you think the fraudulent police officer is part of whether it's a similar case or not? Or something we covered before. But if I were to find a case where it was a regular cop who was doing this and you can't do in the position and new and et cetera, et cetera, I understand that's not, you're going to say it's not our case, but does the fake cop part matter at all for qualified immunity? Clearly established. Yeah. I am just going to say that's not our case, of course, but then answer your question that I think it does matter. But I think ultimately I admitted before I said before that ultimately the fake cop thing is a red Herring. Everyone believed this guy was a cop. So I think that if we found a case involving an actual cop who was, who was misbehaving in a school environment, that, that, that would be, there would essentially be a decent argument that that would be, uh, uh, something controlling it or white V poly. I haven't been able to find that not only in the sixth circuit, but nationwide. And if Ms. Consente had a LexisNexis account. I think we've got it. So, um, thank you so much for your argument, Mr. Gilbert, you've got your rebuttal. Thank you, Your Honor. If I could go first of all, to the hearsay issue, certainly those documents would show, um, additional knowledge. And, and those, uh, tapes are kind of interesting tastes because a number of the people were simply laughing in those tapes and they were saying all the things that this guy was doing. It also assists us in knowing that they knew that these people, this guy, uh, Hinden was not a police officer. Why do I say that? Because there's no other person that police officer that came to that building that did what Hinden did. Um, Mr. Gilbert, Mr. Gilbert, you were, you were going through the tapes and kind of hinting at prejudice. Give me the best statement from the tapes, like the statement that you, you're really frustrated that in summary judgment motions and in front of Judge Lula, you couldn't use this, this statement. What's, what's the best one or two that really would have changed the flavor of the summary judgment motion? Well, I, I, as I sit here, I cannot tell you that, uh, the, there were a number of them. What strikes me is Vincenti and Vincenti and some of them saying that they didn't know he was a police officer, but they did cover some of that in their deposition as well. The thing that we have in regards to, uh, Hinden is that you notice the defendant never talked about this guy named James. James is still on the, on the run. We don't know who he is, but this guy comes in and he assists, uh, Hinden. Nobody else did that. We know that, uh, the, uh, the contract specifically does not allow resource officers to get involved in discipline at the, at the schools. They're not allowed to do, um, any type of discipline. They're not allowed to enforce the rules. And then, and this guy Hinden came in, not only did he start grab, when he first got there, he grabbed a kid, assaulted the kid, pushed him down in the chair, handcuffed him and started cursing at him. And they all indicate that there's no other police officer that did anything like that. And we feel that is a jury question as to whether he, they really thought he was a police officer. But, uh, there were things that he did that made us kind of question. Now those type of in their minds, there was some question about it. And the other thing is that there was, uh, the court allowed selective hearsay here. You know, for example, uh, they, they're claiming that they got some call from a parent saying that she was a, a boyfriend of this police officer. Well, you know, they, they intentionally did not call that person that did not question that person because there's some question of whether that is in fact true, but that's what the, and the court took that hook, line and sinker. And this, this guy, James was a carpet cleaner. I mean, how bad can you get there? He was a carpet cleaner comes in and he gets school records. They give this guy school records. He's calling these parents and so forth. I mean, that, that is bizarre. Yes. This is a bizarre case. And in regards to the MH case, which I'll go back to the council said that the mother gave consent for her child to be handcuffed. That's absolutely not true. And she indicated clearly that it was the policeman that came to her and said, quote unquote, Hinden, I am going to handcuff your child. And the problem is that Morrison knew this before she went into the, to the, to the room, got this seven year old kid out, brought him out to the hall where Hinden is there. If you, if that's not an affirmative act, I don't know what he is. And the, and this kid is, is handcuffed and crying, boo-hooing, and they parade him through the school to the office. I mean, what is that about? I mean, that is as crazy as you get. And, and, and yes, we have, these are young, unsophisticated mothers. They happen to be African-American. These kids happen to be African-American. I guess my other point here is that there was, there was no other kids other than African-American and kids that are on disability that were messed with here. And we do raise the point that this is enough to get us beyond the ADA and also Title VI. And also we do have in our brief, and I'll cite that just briefly, is that the defendant did not raise claims in regards to a number of these issues and claims in the complaint. The court granted summary judgment on everything, but they didn't even file summary judgment on some of this stuff. And so our point is that clearly look at the totality of this. It is, it's a case that is bizarre and we shouldn't have to get a similar case, but nobody in America deals with things like Akron Public Schools does. Thank you, Mr. Gilbert. And thank you, Mr. Strang. We appreciate your briefs and your argument. And as always for answering our questions, it is an interesting, unusual case, that's for sure. So thank you very much. The case will be submitted.